UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Brady Kemp, III, | ) | C/A No. 1:14-4840-JMC-KDW |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| United Parcel Service, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff Brady Kemp, III ("Plaintiff" or "Kemp") filed this action against his former employer, Defendant United Parcel Service, Inc. ("Defendant" or "UPS"), alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981.[1] Am. Compl., ECF No. 12. At the close of discovery, Defendant moved for summary judgment. ECF No. 49. Plaintiff responded to this motion, ECF No. 54; and Defendant filed a reply, ECF No. 55. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a report and recommendation ("Report") regarding Defendant's pending dispositive motion. Having reviewed the parties' submissions and the applicable law, the undersigned recommends Defendant's Motion, ECF No. 49, be *granted* and this matter be ended.

---

[1] Although Plaintiff's Amended Complaint does not contain a separate cause of action for harassment/hostile work environment, some language in that pleading suggested he may have been attempting to pursue such a claim. Accordingly, Defendant argued summary judgment would be appropriate against any such claim. *See* ECF No. 49-6 at 21-24. As Plaintiff did not respond to those arguments in opposing summary judgment, any such claim has been abandoned by Plaintiff. *See Haggins v. Sam's E., Inc.*, No. CV 3:13-1596-MBS, 2015 WL 5781390, at *6 n.5 (D.S.C. Sept. 30, 2015) (noting claim not defended in opposing summary judgment was abandoned).

I.    Factual background[2]

A.  UPS's business operations

UPS's small-package delivery business operates world-wide; its United States operation is divided into two geographic "regions," and each of these regions is divided into a number of "districts." Declaration of UPS's Labor Manager for South Atlantic District, Walter Dickson ("Dickson Decl.") ¶ 3, ECF No. 49-3. Each district includes a number of "package centers," which are responsible for the pickup and delivery of packages from customers in an assigned area. *Id.* ¶¶ 3–4. Packages are delivered to and picked up from UPS customers in brown delivery trucks, which are referred to as "package cars;" and the employees who operate these package cars are referred to as package car drivers." *See id.* ¶ 4; Plaintiff's Deposition ("Pl. Dep.") 81–82, ECF No. 49-1.[3] The package centers are managed by business managers and, typically, several supervisors, who supervise either full-time employees, such as package car drivers, or part-time employees. Pl. Dep. 92, 97; Dickson Decl. ¶ 4.

B.  Plaintiff's employment with UPS

Plaintiff worked out of the Aiken (South Carolina) package center (the "Aiken Center"), which is in the South Atlantic District and the East Region. Dickson Decl. ¶¶ 2-3. During the relevant timeframe, Business Managers Hazel Bennett ("Bennett") (African American) and Ray

[2] To the extent supported by the record, the court considers the facts in the light most favorable to Plaintiff, the nonmoving party, and potentially differing accounts of events are noted. Here, some of the background facts are derived from Defendant's Motion and were not addressed by Plaintiff. Further, some of Plaintiff's "facts" are argumentative in nature and include no record citations, contrary to the requirement of Local Civil Rule 7.05(A)(4) (D.S.C.) (requiring memorandum opposing summary-judgment motion to include a "concise statement of the material facts in dispute with reference to the location in the record"). To the extent necessary, additional facts are set out in relevant portions of this Report.

[3] Most cited excerpts from Plaintiff's deposition are available at ECF No. 49-1, which was provided by Defendant. Plaintiff has also provided several pages of his deposition, available at ECF No. 54-9. Finally, Defendant has included several additional pages of Plaintiff's deposition transcript in its reply. ECF No. 55-3. This Report will include a reference to ECF No. 54-9 or 55-3 for citations to Plaintiff's deposition testimony not available at ECF No. 49-1.

Boulware ("Boulware") (Caucasian) managed the Aiken Center. Pl. Dep. 92–93; Boulware Decl. ¶ 2, ECF No. 49-2. Boulware worked as the Aiken Center Business Manager from around November 2010 until February 2011, a position Bennett held from about February 2011 until December 2011. Pl. Dep. 92–93; Boulware Decl. ¶ 2. Boulware resumed the role of Aiken Center Business Manager around January 2012 and worked in that capacity until his August 2015 retirement. Pl. Dep. 92–93; Boulware Decl. ¶ 2. From 2012 until his retirement, Boulware reported to Division Manager Emanuel Yarrell ("Yarrell") (African American). Boulware Decl. ¶ 2.

Plaintiff began his employment at UPS as a part-time employee and, in 1975, he began working as a full-time package car driver. Pl. Dep. 43–46. As a package car driver, Plaintiff was responsible for safely making pick-ups and deliveries to customers on his assigned route. *Id.* at 82–83, Dickson Decl. ¶ 5. The terms and conditions of package car drivers' employment are governed by the Collective Bargaining Agreement ("CBA") between UPS and the International Brotherhood of Teamsters ("Union"). *See* CBA, ECF No. 49-1 at 54–225; Pl. Dep. 58–59; Dickson Decl. ¶ 11. As Union members, package car drivers complete a yearly bid process to determine which route they will drive. Pl. Dep. 82–83; Dickson Decl. ¶ 16. A route is awarded to the most senior package car driver who bids on that route. Pl. Dep. 83; Dickson Decl. ¶ 16. For the last several years of his employment at UPS, Plaintiff bid on and drove on route 15C,[4] which encompassed the Barnwell area of Aiken County, South Carolina. Pl. Dep. 82–83; Declaration of Plaintiff's On-Road Supervisor John Smaltz ("Smaltz Decl.") ¶ 5. This route included both residential and commercial pickups and deliveries. Pl. Dep. 83. Plaintiff testified that, when he

---

[4] Plaintiff testified he believed the route number was changed to be called Route 15D near the end of his employment, Pl. Dep. 82, but refers to it as Route 15C in responding to Defendant's Motion, *see* Pl. Mem. 3.

bid on the route, he told "Danny"[5] that he was bidding the route that "goes with" a trailer, but that, once Plaintiff had the route he gave the trailer to a Caucasian driver. Pl. Dep. 247, ECF No. 54-9. Plaintiff worked as a package car driver until his May 2012 termination. Plaintiff also was a member of the Safety and Wellness Committees at the Aiken Center. Pl. Dep. 74–77. As discussed more fully within, Plaintiff was a Union member and served as a Union steward for 10-to-15 years of his tenure with UPS. *Id.* at 59, 61. A Union steward works to "protect the rights of the hourly employees who are union members" and sometimes files grievances on behalf of an employee and represents the employee in discussions with management. *See id.* at 62-63.

    C.  UPS policies and procedures applicable to package car drivers

    Package car drivers must follow specific work rules and methods to ensure efficient customer service, including the ability to track the delivery status of packages. Pl. Dep. 82–84, Dickson Decl. ¶ 6. The performance of package car drivers is measured in large part by how well they adhere to proper delivery methods and procedures. Pl. Dep. 88, Dickson Decl. ¶ 6. In this regard, all package car drivers use an electronic, hand-held device known as a Delivery Information Acquisition Device ("DIAD"), which tracks package car drivers' activities throughout the work day. Pl. Dep. 84–87; Dickson Decl. ¶ 7. The DIAD is used to scan and track a driver's deliveries and pickups, and package car drivers are required to follow specific work rules and methods with respect to DIAD data entry to ensure that they accurately record their delivery and pickup information at the time when work is actually being performed. Pl. Dep. 84–87, Dickson Decl. ¶ 8. When delivering a package, a package car driver is required to scan the shipping label on the package to record the precise time of delivery or attempted delivery. Pl.

---

[5] The record does not make clear who "Danny" was, although it was likely Danny Ferguson, one of Plaintiff's on-road supervisors. In addition, Plaintiff's "Statement of Facts" indicates the route "contained many large pickups and deliveries, some with close to thirty packages[,]" but provides no record support for this statement.

Dep. 85, Dickson Decl. ¶ 8. The information entered into the a driver's DIAD is then uploaded to a package tracking system so that UPS's customers and employees can monitor the status of packages. Pl. Dep. 85–86, Dickson Decl. ¶ 9. This ability to accurately track packages "minute by minute" is one of the primary services that UPS provides to its customers, and the accuracy of the package-tracking system is entirely dependent upon the accuracy and integrity of the DIAD input provided by package car drivers. Dickson Decl. ¶ 9. Every morning, each package car is loaded with the packages to be delivered along its route. *Id.* ¶ 10, Once the packages are on the car, the package car driver must attempt to deliver every package. Dickson Decl. ¶ 10. In addition, every package must have a DIAD entry at the time of the delivery or attempted delivery to ensure that UPS customers and employees can accurately track the packages. Pl. Dep. 85–86, Dickson Decl. ¶ 10.

D.  The CBA's grievance procedure

The CBA sets out a grievance procedure to be used by employees who are subject to the CBA. This grievance procedure is used to resolve disputes between UPS and the Union regarding disciplinary action for employees covered by the CBA. Pl. Dep. 69–70, Dickson Decl. ¶ 13. Once a grievance is filed, the CBA provides that the business manager and the Union steward typically review the grievance to discuss the offense. The next step is to conduct a local-level hearing where representatives of UPS meet with the grievant and Union representatives to discuss the merits of the grievance, exchange documents, and try to resolve the grievance. Pl. Dep. 71–72,[6] Dickson Decl. ¶ 11. The CBA provides that, if a grievance cannot be resolved at the local-level hearing, it proceeds to a regional-level panel where the grievance is heard by a panel consisting of an equal number of UPS representatives (usually UPS personnel from other districts) and Union representatives who are not employees of UPS. Pl. Dep. 73–74, Dickson

---

[6] Plaintiff testified that the local-level hearing was sometimes "[n]ever finished." Pl. Dep. 73.

Decl. ¶ 11. This hearing is typically referred to as the "panel hearing" and, unless the panel deadlocks with a three-three vote, the result obtained at this level is final and binding on both UPS and the Union. Pl. Dep. 73–74, Dickson Decl. ¶ 11. In the event of a three-three deadlock, an arbitrator who had been present at the panel hearing makes a final decision that is binding on both UPS and the Union. Dickson Decl. ¶ 11.

The CBA also governs the discipline of employees subject to the CBA. The CBA's provisions relating to discipline provide for two levels of infractions: (1) violations subject to progressive discipline; and (2) violations for which immediate discharge is warranted, referred to as "cardinal sins." Pl. Dep. 64, 68,[7] Dickson Decl. ¶ 12. For the first category of violations, Article 50 of the CBA requires progressive discipline consisting of a verbal or written warning for initial instances of performance issues, insubordination, and failure to follow instructions, among other things. Pl. Dep. 64–65, Dickson Decl. ¶ 12, CBA art. 50, ECF No. 49-3 at 18–19. If the employee receiving these verbal and written warnings fails to remedy the behavior at issue, then the employee typically receives a suspension. Pl. Dep. 65, Dickson Decl. ¶ 12, CBA art. 50, ECF No. 49-3 at 18–19. After a suspension, the next level of discipline that may be imposed is discharge from employment. Pl. Dep. 65, Dickson Decl. ¶ 12, CBA art. 50, ECF No. 49-3 at 18–19. The CBA provides that, for purposes of progressive discipline, written warning notices or file write-ups stay in effect for a period of nine months and the severity of future discipline is determined by the level of write-ups in effect in an employee's file at that time. Pl. Dep. 65–66, Dickson Decl. ¶ 12, CBA art. 50, ECF No. 49-3 at 18–19. If the employee files a grievance for a suspension or discharge issued under progressive discipline, Article 7 of the CBA provides that

---

[7] In deposition, Plaintiff agreed that the CBA provided for these two infraction levels, but he testified that often the levels and other discipline-related procedures in the CBA only "supposedly" worked in practice the way they were set out in the CBA. *E.g.* Pl. Dep. 68. Plaintiff's specific arguments regarding the way the CBA's procedures impacted him are discussed within.

the employee continues working pending the resolution of the grievance. Pl. Dep. 66–68, Dickson Decl. ¶ 12, CBA art. 50, ECF No. 49-3 at 18–19. These are called "working suspensions" or "working discharges." Dickson Decl. ¶ 12. Cardinal sins, on the other hand, warrant immediate discharge without progressive discipline or a working discharge. Pl. Dep. 68, Dickson Decl. ¶ 12.

The CBA requires that a grievance be filed by an employee (or by the Union acting on the employee's behalf) within 10 days of receiving any form of discipline. Pl. Dep. 70, Dickson Decl. ¶ 13, CBA art. 50. A discharge, suspension, or warning notice is considered received on the date an employee is informed by UPS management that he will receive the disciplinary letter and the date the letter is sent to the Union and to the employee's home address on file with UPS. Dickson Decl. ¶ 13. Failure to file a timely grievance within 10 days of receipt of discipline precludes an employee from contesting the disciplinary action, and the discipline will stand as issued. Pl. Dep. 70, Dickson Decl. ¶ 13. If an employee fails to file a timely grievance in response to a working discharge, then the discharge takes effect immediately and the employee is removed from service. Dickson Decl. ¶ 13.

During the grievance process, employees are permitted to seek assistance from a Union business agent or a Union steward—a UPS employee who represents hourly, bargaining unit employees with respect to their grievances or concerns. Pl. Dep. 62–63, 69–70, Dickson Decl. ¶ 14. Union stewards are also permitted to file grievances on behalf of employees. Pl. Dep. 63–64, 69–70, Dickson Decl. ¶ 14. Plaintiff served as a Union steward for 10-to-15 years during his employment with UPS, including at the time of the termination of his employment in 2012. Pl. Dep. 61–62, Dickson Decl. ¶ 14.

E.      Plaintiff's disciplinary history and termination

Plaintiff received performance-related progressive discipline on four occasions during the last 18 months of his employment with UPS. [8]

1.    Plaintiff's November 2010 warning letter

On November 23, 2010, UPS issued an "official warning letter" to Plaintiff concerning his failure to follow "proper Delivery and Pickup methods, which resulted in a missed package" on November 18, 2010. Nov. 23, 2010 Letter, ex. 4 to Pl. Dep., ECF No. 49-1 at 228. *See* Dickson Decl. ¶ 19. The letter referenced a meeting held on November 19, 2010 with Plaintiff, Union Representative Kevin McClellan, and On-Car Supervisor Sean Calcutt. The letter UPS issued Plaintiff encouraged him to correct his behavior to avoid further disciplinary action, up to and including termination of employment. Plaintiff testified that he never received a warning letter and was "not sure" he recalled the incident described in the letter. Pl. Dep. 100.

2.    Plaintiff's January 2011 suspension letter

Plaintiff received an "official suspension letter" from UPS dated January 24, 2011. Jan. 24, 2011 Letter, ex. 5 to Pl. Dep., ECF No. 49-1 at 229. The reason for this suspension letter was Plaintiff's failure to follow proper delivery and pickup methods when he coded 19 packages as "missed." *Id.* The letter referred back to Plaintiff's November 2010 warning letter and noted that because of his failure to correct his behavior of failing to follow methods and procedures, he was being suspended for three days. *Id.* The suspension remained for nine months. Dickson Decl. ¶ 21. Plaintiff testified that he did not specifically recall the letter but that he remembered the incident. Pl. Dep. 102. Plaintiff indicated there was a snowstorm that day and deliveries began

---

[8] The court acknowledges that Plaintiff states he does not recall having received a November 2010 write-up and argues the January 2011 suspension letter should not be considered because it took place more than nine months before he was terminated. Pl. Mem. 7–8 nn.1–2. Nonetheless, Defendant has provided competent evidence of these events, making it appropriate to reference them herein.

late. He was unable to deliver all of the packages because of that delay. Plaintiff noted other drivers had been advised to code any packages they were unable to deliver as "inclement weather," and not as "missed packages." Plaintiff testified that he had not been told to use the inclement-weather code. Pl. Dep. 102–05. Plaintiff further indicated he never missed any work nor did he receive decreased pay as the result of the January 2011 suspension letter. *Id.* at 121-22.

### 3. Plaintiff's September 2011 discharge letter and grievance

On September 1, 2011, UPS issued an "official Discharge letter" based on his August 22, 2011 "fail[ure] to follow proper driver delivery methods by recording a package after 17:00 (5 pm)." Sept. 1, 2011 Discharge Letter, ex. 6 to Pl. Dep., ECF No. 49-1 at 230. As explained by Dickson, when delivering to commercial customers with normal business hours that are between 9:00 a.m. and 5:00 p.m., package car drivers are to deliver the packages between the hours of 9:00 a.m. and 12:00 p.m. or between 1:00 p.m. and 5:00 p.m. Dickson Decl. ¶ 22. If a package car driver attempts delivery during the lunch hour or after 5:00 p.m. and the customer's business is closed, he should code the package as "missed" and return it to the package center so delivery can be attempted the next day. Dickson Decl. ¶ 22. There is a "closed" code available; however, it is only proper to code a delivery to a commercial customer as "closed" if delivery is attempted during normal business hours and the customer's business is actually closed. It is not proper to use the "closed" code during the 12:00 to 1:00 p.m. lunch hour or after 5:00 p.m. *Id.*, Pl. Dep. 111 (acknowledging the rule, and indicating the business customer to whom he delivered after

5:00 p.m. had given him prior permission to deliver in the manner he had done on the day in question).[9]

Plaintiff filed a grievance challenging the September 2011 discharge letter. *See* Sept. 9, 2011 Grievance, ex. 7 to Pl. Dep., ECF No. 49-1 at 231.[10] Plaintiff acknowledged having filed this grievance with the Union, but indicates he did not recall a local hearing or other action following that grievance, nor did he miss any work as a result of the September 2011 discharge letter. Pl. Dep. 116–21. Because he filed a grievance, Plaintiff continued to work after receiving the discharge letter. Plaintiff indicated he never heard anything back from the Union or from management as to the grievance he filed concerning the September 2011 letter. *Id.* at 118-21. Plaintiff testified that it "was accepted practice and customary in that building they never heard the grievances." *Id.* at 120.

### 4. Plaintiff's April 2012 discharge letter and termination

The incident that ultimately resulted in Plaintiff's discharge and separation from UPS occurred in April 2012, when Plaintiff failed to make a scheduled pickup on April 11, 2012.[11] Pl. Dep. 122–29, Dickson Decl. ¶¶ 25-26, Boulware Decl. ¶ 7, Smaltz Decl. ¶ 7. As a result of the failed pickup, a total of 26 packages were left. To fulfill the customer's commitment to its customers, UPS agreed to upgrade all of the missed packages to Next Day Air service so that they would still arrive on time. Pl. Dep. 129, Boulware Decl. ¶ 7, Dickson Decl. ¶ 26, Smaltz

---

[9] Plaintiff indicated he recalled the incident and the discussion with his supervisor and Union steward about the matter; however, he "[did not] remember [receiving] a discharge letter, period." Pl. Dep. 116.

[10] The provided copy of Plaintiff's grievance concerning the September 1, 2011 discharge letter is very difficult to read.

[11] Plaintiff acknowledged the missed pickup and, as set forth within when pertinent, Plaintiff has provided his recollection of the reason for the missed pickup, including his discussion with the business owner. Pl. Dep. 122–28. Plaintiff's dispute as to whether he received a "discharge letter" or lesser discipline for the April 2012 incident is discussed within.

Decl. ¶ 7. This upgrade resulted in an approximately $3,000 loss in revenue to UPS. Boulware Decl. ¶ 7; Dickson Decl. ¶ 26.

On April 12, 2012, Boulware and Union Steward Steve Huff met with Plaintiff and advised him he would be issued a *warning* letter for the April 11, 2012 infraction. Boulware Decl. ¶ 8 & ex. D thereto (2012 "Record of Supervisor's Discussions with Employee," referred to in depositions as a "Pittsburg form"), ECF No. 49-2 at 17. Boulware had been unaware of the September 2011 discipline Plaintiff had received from former Business Manager Bennett, making him unaware of where Plaintiff was in the disciplinary progression. Boulware Decl. ¶ 8 & ex. D thereto, Smaltz Decl. ¶ 8 (indicating Smaltz had prepared the draft warning letter for Plaintiff because Smaltz had forgotten about the September 2011 discipline). UPS's Labor Department notified Boulware and Smaltz that, based on where Plaintiff was in the progressive disciplinary process, he was due to receive a *discharge* letter. Boulware Decl. ¶ 8; Dickson Decl. ¶ 27; Smaltz Decl. ¶ 8.

On April 16, 2012, Smaltz met with Plaintiff and Union Steward Bill Sizemore to inform Plaintiff that the warning letter had been issued in error. Pl. Dep. 156, 158–59, 161 & ex. 3 thereto (Pittsburg form);[12] Smaltz Decl. ¶ 9 & ex. A thereto (Pittsburg form). Smaltz states he advised Plaintiff at that time that the warning letter was being replaced with a discharge letter. Smaltz Decl. ¶ 9.

Plaintiff has proffered Sizemore's affidavit in which Sizemore testifies that at the April 16, 2012 meeting Smaltz had advised Plaintiff the warning letter had been in error, Plaintiff should have received a suspension, and because UPS had "messed up" Plaintiff would receive a

---

[12] Plaintiff testified that he had seen a different version of his 2012 Pittsburgh form at one time— one on which warning had been "scratched through" and "put termination." Pl. Dep. 156.

"working suspension." Sizemore Aff., ECF No. 54-2.[13] Sizemore indicates there was no mention of termination at that April 16, 2012 meeting. *Id.* Sizemore states Smaltz showed Plaintiff the "file write up" at that time, although he is unsure whether Plaintiff read the file write up. Sizemore did not read the file write up then and indicated neither he nor Plaintiff signed that write up. *Id.* Union Steward Sizemore indicated Plaintiff "was satisfied with a suspension for missing the pickup, so [Sizemore] was satisfied." *Id.* In Plaintiff's affidavit, he states he and Sizemore met with Smaltz on April 16, 2012, at which time Smaltz "informed [him] that [he] would be suspended instead of written up because of [his] previous disciplinary history." Pl. Aff. ¶ 7, ECF No. 54-8. Plaintiff indicated he did not file a grievance because he "was willing to accept the suspension." *Id.*

On April 18, 2012, UPS issued Plaintiff an "official Discharge letter as outlined in [the CBA]" for this violation of UPS's delivery methods. *See* Apr. 18, 2012 Discharge Letter, ex. 8 to Pl. Dep., ECF No. 49-1 at 232; Pl. Dep. 122; Boulware Decl. ¶ 9; Dickson Decl. ¶¶ 26-28. The letter referenced an April 12, 2012 meeting of Plaintiff and Boulware discussing Plaintiff's "failure to follow proper methods and procedures" on April 11, 2012, when he failed to make a scheduled pickup but recording it as completed. Apr. 18, 2012 Ltr. This Discharge letter also provides:

> We are bringing this matter to your attention with the expectation that this problem will be corrected, thereby, avoiding the necessity for further disciplinary action, up to and including, the termination of your employment.

*Id.*

UPS sent the Discharge letter via Certified Mail to the Union and to Plaintiff at the mailing address he had provided to UPS. April 18, 2012 Discharge Letter, Pl. Dep. 22, 101;

---

[13] These differing recollections of events are discussed within.

Dickson Decl. ¶ 28. Plaintiff acknowledged having received this letter. Pl. Dep. 130.[14] Neither Plaintiff nor the Union (on Plaintiff's behalf) filed a grievance within 10 days of the date the discharge letter was sent to Plaintiff and the Union. Pl. Dep. 129–30, Boulware Decl. ¶ 10, Dickson Decl. ¶ 29. Because no grievance was filed, Plaintiff's discharge became effective immediately, and UPS relieved him of service on May 2, 2012. Pl. Dep. 136–37, Boulware Decl. ¶ 10; Dickson Decl. ¶ 29.

On Monday, May 7, 2012, Plaintiff, Union Business Agent Powell Caldwell, Union Steward Bill Sizemore, Union Steward Steve Huff, Aiken Business Manager Boulware, and UPS Labor Manager Dickson met at the Aiken Center to discuss the termination of Plaintiff. Pl. Dep. 130, Dickson Decl. ¶ 30. During the meeting, UPS confirmed that no grievance had been filed by or on Plaintiff's behalf. Dickson Decl. ¶ 30. Based on Plaintiff's many years of service, Dickson offered Plaintiff the opportunity to resign or retire, but Plaintiff opted to be terminated. *Id.* In his affidavit, Plaintiff indicates the first time he was notified by UPS that he was being terminated rather than suspended for the missed pickup was at this May 7, 2012 meeting. Pl. Aff. ¶ 8, ECF No. 54-8. After being advised of his termination, Plaintiff went to his employee locker to clear out his personal items, but his items had been removed and were never returned to him. Pl. Dep. 15.[15] In his memorandum, Plaintiff indicates his locker had contained his copies of documentation regarding prior disciplinary actions and complaints he had filed in the past. Pl. Mem. 10.

On May 14, 2012, which was one week after Plaintiff submits he was first advised of the discharge, Plaintiff returned to UPS and attempted to file a grievance appealing his discharge. Pl.

---

[14] Plaintiff's testimony acknowledging receipt of the April 18, 2012 Termination letter does not indicate when he received that letter. *See* Pl. Dep. 130.

[15] It is not clear exactly which day Plaintiff went to his locker and found his items had been removed.

Dep. 145–48 & ex. 9 thereto (May 14, 2012 Grievance, ECF No. 49-1 at 233); Dickson Decl. ¶ 31; Smaltz Decl. ¶ 10. The May 14, 2014 Grievance lists May 7, 2012 as the Date Grievance Occurred. Plaintiff submits he was wrongfully terminated and his infractions were incorrect. *Id.* Plaintiff indicates his "discharge [] was announced as a suspension," and asks that it be rescinded and he be made whole. *Id.*

Plaintiff presented the Grievance to Smaltz for signature on the "Mgmt Signature" line. Smaltz Decl. ¶ 10. Smaltz began to sign it, but stopped and advised Plaintiff to see Boulware, who would be more familiar with Plaintiff's employment status at that time. *Id.*, Pl. Dep. 145. Smaltz told Plaintiff that Boulware was not in that day, and Plaintiff never returned to see Boulware about the Grievance. Pl. Dep. 148-49. Plaintiff mailed a copy of that Grievance to the Union on May 14, 2012. Pl. Aff. ¶ 9.

As the Grievance was submitted 26 days after UPS had issued the April 18, 2012 Discharge letter to Plaintiff, Defendant indicates the Grievance was not timely. *See* Dickson Decl. ¶ 31, *id.* ¶ 13 (noting CBA required that grievances be filed within 10 days of receiving notice of a discharge, suspension, or warning).

Dickson indicates a local-level hearing was held on May 22, 2012 regarding Plaintiff's Grievance. Dickson noted no resolution could be reached because the grievance was untimely. Dickson Decl. ¶ 32. Plaintiff was not present at any local-level hearing, and testified he knew nothing about any such hearing as UPS had never accepted the Grievance. Pl. Dep. 149.

Accordingly, Plaintiff's Grievance was heard at a panel hearing in Baltimore, Maryland in June 2012. Dickson Decl. ¶ 33. UPS and the Union presented evidence supporting their respective positions. Pl. Dep. 152–53, 155–56, Boulware Decl. ¶ 11; Dickson Decl. ¶ 33; Smaltz Decl. ¶ 11. The joint labor panel upheld Plaintiff's discharge under the CBA because the panel

concluded Plaintiff had not filed a timely grievance contesting the April 18, 2012 discharge letter issued to him. Pl. Dep. 161, Boulware Decl. ¶ 11; Dickson Decl. ¶ 33; Smaltz Decl. ¶ 11.

After Plaintiff's termination, Jim Drennon (Caucasian Male) was assigned to Plaintiff's former route. Pl. Mem. 11. Plaintiff testified that Drennon was provided the assistance of a tractor-trailer to assist with that route. Pl. Dep. 300-03, ECF Nos. 49-1 and 54-9.

F.   Plaintiff's EEOC charge and litigation

On September 13, 2012, Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission in which he complained of age[16] and race discrimination. *See* Charge, ECF No. 49-1 at 235. On September 17, 2013, Plaintiff filed an Amended Charge of Discrimination in which he also asserted a retaliation claim. Am. Charge, ECF No. 49-1 at 237. On September 30, 2014, the EEOC issued a Dismissal and Notice of Rights—known as a "Right-to-Sue Letter." ECF No. 149-1 at 250. Plaintiff filed this suit on December 23, 2014, and filed an Amended Complaint on February 18, 2015. ECF Nos. 1, 12.

II.     Standard of Review

A.   Motion for summary judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

---

[16] Plaintiff is not pursuing an age-discrimination claim in this litigation.

those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at

the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

B.  Burden of proof, generally

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff does not argue he has presented any direct evidence of discrimination, *see* Pl. Mem. 13–24, so the court considers his claims under the burden-shifting framework. Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

While intermediate evidentiary burdens shift back and forth, the ultimate burden of persuasion that the defendant engaged in intentional discrimination remains at all times with the

plaintiff. *See Reeves,* 530 U.S. at 146–47 ("The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'") (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993)).

Plaintiff brings claims of race discrimination and retaliation. His Amended Complaint raises his discrimination claim pursuant to both Title VII and 42 U.S.C. § 1981.[17] Although his pleading is unclear as to the statutory scheme(s) under which he brings his retaliation claim, his response to Defendant's Motion focuses only on Title VII. Both Title VII and § 1981 claims follow the same burden-shifting proof structure. The elements for establishing a prima facie case of discrimination and retaliation claims are the same under § 1981 as under Title VII. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (retaliation); *Gairola v. Com. of Va. Dept. of Gen. Servs.,* 753 F.2d 1281, 1285–86 (4th Cir. 1985) (discrimination). As the Court of Appeals for the Fourth Circuit ("Fourth Circuit") noted in *Boyer-Liberto*, however, "the causation standard for a Title VII claim may differ from that for a § 1981 claim after the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar,* 133 S. Ct. 2517, 2533 (2013) (holding that but-for standard of causation applies to Title VII retaliation claims)" *Boyer-Liberto*, 786 F.3d at 281 n.5. The *Boyer-Liberto* court did not consider the question of differing causation standards, however, as causation was not at issue in that matter. *Id.*

---

[17] Although Plaintiff's Amended Complaint also generally references 42 U.S.C. § 1983 and the U.S. Equal Employment Opportunity Act ("EEOA"), neither is applicable as UPS is neither a "state actor," as referenced in § 1983, nor a federal agency, as referenced in the EEOA. Plaintiff's pleading also references the South Carolina Human Affairs Law ("SCHAL"), which generally follows a Title VII analysis. In his response to summary judgment, Plaintiff does not reference § 1983, the EEOA, or SCHAL. Additionally, the undersigned notes Plaintiff's response to summary judgment does not reference § 1981.

III.    Analysis

A.  Title VII racial discrimination claim for disparate treatment

Plaintiff alleges he was terminated because of his race. When, as here, a plaintiff does not argue he has direct evidence of discrimination, his claim is considered pursuant to the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of Title VII discrimination, Plaintiff must establish the following elements: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Further, as Plaintiff is challenging his termination, this fourth prong can be satisfied by a showing that his "'position remained open or was filled by similarly qualified applicants outside the protected class.'" *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir. 2004) (en banc)).

1.  Prima facie case

Defendant acknowledges Plaintiff is the member of a protected class and that he suffered an adverse action upon being discharged. Defendant submits Plaintiff cannot establish the second and fourth elements of his prima facie discrimination claim. Regarding the second element— satisfactory job performance—Defendant argues Plaintiff's several rules infractions that culminated in his termination prevent him from demonstrating he was meeting UPS's legitimate expectations. Def.'s Mem. 14–15[18] (submitting the November 2010 warning for missing a package, the January 2011 suspension for missing packages, the September 2011 discharge letter for improper package recordation, and the April 2012 discharge letter for missing a scheduled

---

[18] References to page numbers in Defendant's Memorandum and Reply refer to the page numbers at the bottom of the pages, not to the ECF-generated page numbers.

pickup) demonstrate Plaintiff was not meeting legitimate employer expectations at the time he was discharged). In response, Plaintiff argues he was meeting UPS's expectations, offering reasons the incidents on which UPS relies do not indicate otherwise. Pl. Mem. 14–18.

To meet the third element of the prima facie case, Plaintiff must proffer evidence that "[]he was performing h[is] job duties at a level that met h[is] employer's legitimate expectations at the time of the adverse employment action." *Miles v. Dell, Inc.,* 429 F.3d 480, 485 (4th Cir. 2005). The Fourth Circuit has clarified as to the third element, "a plaintiff must show by a preponderance of the evidence that he met the employer's legitimate job expectations in order to prove his prima facie case, [and] the employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations." *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 516 (4th Cir. 2006). The court has qualified this requirement by clarifying that a plaintiff's burden is not an onerous one, requiring only that a plaintiff present evidence to create a question of fact that the employer's "proffered 'expectation' is not, in fact, legitimate at all." *Id.* at 517. Accordingly, a plaintiff is "free to demonstrate that his employer's [] expectations are not, in fact, 'legitimate.'" *Id.*

Although Plaintiff's burden with respect to the third prong is not onerous, the court still requires evidence other than Plaintiff's "own self-serving conclusions" that he met UPS's legitimate expectations. Moreover, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 960–61 (4th Cir. 1996) (internal citation and quotation omitted).

Here, Plaintiff separately challenges each of the disciplinary issues set out by Defendant regarding the performance prong. As to the November 2010 warning letter, Plaintiff argues Defendant has failed to provide any details about what happened, other than that he "failed to

follow proper methods and procedures." Pl. Mem. 14. He also submits that the November 2010 matter is too remote because the CBA only permits disciplinary actions to remain on record for nine months. *Id.*

As to the January 24, 2011 suspension letter, Plaintiff offers more details regarding the incident at issue and explains that the discipline was given because he coded packages he could not deliver on account of inclement weather as "missed" because he had not been advised to code them another way. Pl. Mem. 15 (citing Pl. Dep. 104). Plaintiff also indicates he does not recall having been suspended for this situation. *Id.* Plaintiff explains that he advised his supervisors Ferguson and Boulware that he would not be able to get all of his packages delivered because of the excess volume and the fact that he was starting out some three hours late due to inclement weather. Pl. Dep. 102–04. Plaintiff submits Defendant's failure to advise him to use a different code for inclement weather is "further proof that Defendant was intentionally nitpicking Plaintiff's work and looking for excuses to pad [his] disciplinary history within the nine month time frame in order to pretextually terminate his employment with Defendant." Pl. Mem. 15.

Plaintiff submits the September 2011 issue for which he received a "discharge letter" should not have been given because he delivered a package later than regulations required based on the customer's request. Pl. Mem. 8, Pl. Dep. 111. Plaintiff recalls the incident but does not recall receiving a discharge letter for it. Pl. Mem. 15, Pl. Dep. 115. Plaintiff grieved the discipline and continued to work. He points out he never received a response from that grievance, and he notes he was not terminated as the result of that incident. Pl. Mem. 15–16. According to Plaintiff, then, the September 2011 disciplinary action clearly was "overturned and therefore should not have been considered by Defendant in making its decisions with regard to any other discipline issued to Plaintiff." Pl. Mem. 16.

Finally, as to the April 2012 discipline for failing to make a multi-package pickup from TNT Printwear, Plaintiff argues issues of fact exist as to when he was issued a Discharge letter and whether his grievance of that discipline was timely filed. Pl. Mem. 16–17. As set out more fully above, Plaintiff was initially issued a warning for a missed pickup but, according to his testimony, Plaintiff was advised during an April 18, 2012 meeting with Smaltz and Union Steward Sizemore that the warning was being upgraded to a *suspension*. Pl. Aff. ¶ 7. Plaintiff proffers the deposition testimony of Sizemore to corroborate that he was told he was receiving a suspension. Sizemore Dep. 34. Plaintiff submits he was not advised he was receiving a discharge letter for the April event until a May 7, 2012 meeting. By May 7, 2012, the grievance period on the April 18 Discharge letter would have run. Plaintiff argues the delayed three-step escalation of the discipline issued creates an issue of fact as to whether he was meeting performance standards. Plaintiff also provides a March 8, 2012 letter from Boulware and Smaltz praising Plaintiff's performance for UPS. *See* ECF No. 49-4. Plaintiff also provides a declaration of Terry Padgett, the owner of TNT Printwear praising Plaintiff's service to TNT and noting he "did not make a fuss" about the missed pickup. Padgett Decl., ECF No. 54-1.

In reply, Defendant correctly notes the nine-month limit of the CBA in no way dictates what the court may consider in evaluating Plaintiff's prima facie case. Similarly unavailing is Plaintiff's reliance on his deposition testimony that he did not recall receiving a letter or any discipline in November 2010. Plaintiff's failure to recall a particular discipline does not create an issue of fact.

Defendant submits Plaintiff's issues with the grievances concerning the September 2011 and April 2012 disciplinary actions need not be considered because what may have taken place in the grievance process does not change the fact that discipline was issued because Plaintiff was

not meeting expectations. Def.'s Reply. 4. UPS goes on to argue Plaintiff has not created any factual issues concerning the discipline issued, claiming it properly followed the CBA's progressive discipline process. *Id.* at 4-5.

In more straightforward situations, the undersigned agrees that the only focus of the "legitimate expectation" prong of the prima facie case is on whether plaintiff was meeting expectations, and that an employee was disciplined for events that actually took place essentially ends the inquiry in the employer's favor. Typically, what may or may not have transpired subsequent to the discipline that was the complained-of adverse event would not be relevant. *See generally Mahomes v. Potter*, 590 F. Supp. 2d 775, 782 (D.S.C. 2008) (finding plaintiff could not establish the satisfactory-performance prong of prima facie termination claim because her incidents of discipline were "fully documented in the record," and, although she was "successful in having some of her punishments reduced [through grievances or EEOC-claims process], she still remained within the relevant progressive disciplinary steps.").

That stated, the undersigned is troubled by the significant factual disputes regarding the level of progressive discipline issued to Plaintiff in April 2012. These events are not as clear-cut as Defendant argues. *See* Def.'s Reply 2–5; *id.* at 3–4 (arguing that "UPS properly followed the progressive discipline process because Plaintiff received a written warning letter in November 2010, a suspension letter two months later in January 2011, a discharge letter eight months later in September and another discharge letter seven months later in April 2012."). Indeed, Plaintiff questions whether the September 2011 letter was one for suspension or termination, noting he grieved the discipline, heard nothing back from that grievance, and was not terminated as a result of that letter. Plaintiff undoubtedly creates factual issues surrounding the April 2012 discipline. After first being advised he would receive a warning letter, Plaintiff was called in and advised

the discipline level was being increased. According to Plaintiff and Union Steward Sizemore, the increase was from a warning to a suspension letter. However, according to Boulware, the discipline was being increased to a discharge letter. The language of the letter itself is quite confusing: although the last sentence indicates the letter is "an official Discharge letter" as provided in the CBA, the paragraph just above that sentence advises Plaintiff the matter is being brought to his attention with the expectation it will be corrected so that "further disciplinary action, up to and including[] termination" can be avoided. ECF No. 49-2 at 19.

Plaintiff submits he did not learn he had been issued a termination letter until too late to file a grievance of that letter. His supervisor, Boulware, noted he had praised Kemp for good performance, acknowledging the March 8, 2012 letter he and Smaltz had sent him in March 2012. Boulware Aff. ¶ 13. Additionally, Boulware stated that "had no choice" but to discipline Plaintiff for the missed pick up, and "had [Plaintiff] filed a timely grievance challenging [April 2012] the discharge letter issued to him, he might have been able to continue working at UPS depending on the outcome of the grievance process under the CBA." *Id.* While undoubtedly speculative, Boulware's acknowledgement that Plaintiff's challenge to the discharge letter might have been overturned the discharge combines with issues raised by Plaintiff to create questions of fact as to whether the performance expectations were legitimate. Giving Plaintiff every benefit of the doubt, and cognizant of the light burden a plaintiff has at the prima facie stage, the undersigned is of the opinion that Plaintiff arguably has raised an issue of fact as to whether UPS's expectations of him were legitimate at the time of his termination. *See generally Warch*, 435 F.3d at 516–17.

The court must also consider the fourth element of Plaintiff's prima facie case. Defendant argues Plaintiff has not proffered an appropriate Caucasian comparator who was similarly

situated but treated more favorably than Plaintiff. Def.'s Mem. 15–18. Defendant argues that a proper comparator would be someone who both failed to make a scheduled pickup and failed to timely grieve the resulting discipline and submits the evidence Plaintiff has provided as to any appropriate competitors is either nonexistent or speculative. *Id.*

In response, Plaintiff does not specifically name any current or former UPS employees he claims to be appropriate comparators, but more generally rehashes his argument that he timely filed a grievance of his termination, that he was meeting legitimate expectations, and that there existed a "culture of holding African Americans and other minorities accountable for infractions where Caucasian employees who committed the same infractions were subject to lesser or no discipline." Pl. Mem. 20; *see id.* at 18–20.

The undersigned agrees with Defendant that Plaintiff's general argument is insufficient to satisfy the fourth prong of his prima facie case concerning a similarly situated comparator. *See, e.g., Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful.").

Nonetheless, the undersigned also considers the alternative forth prong of a prima facie case when a plaintiff is claiming discriminatory termination: whether the position remained open or was filled by a person outside of Plaintiff's protected class. *See Lettieri*, 478 F.3d at 646. Plaintiff has proffered evidence that the individual assigned to Plaintiff's former route was a Caucasian male, Jim Drennon. *See* Pl. Mem. 11; Pl. Dep. 299–300. Defendant briefly argues that this alternative prima facie prong cannot be satisfied here because UPS did not select a "replacement" for Plaintiff upon his termination. Def.'s Reply 7 n.4. Rather, Defendant argues

the terms of the CBA required that the senior-most eligible employees were to service that route until it came up for bid. *Id.* (citing Smaltz Decl. ¶ 13)).

Defendant also argues this alternative prong of the prima facie analysis need not be considered because Plaintiff did not discuss it in opposing summary judgment. However, Plaintiff did reference the fact that he was replaced by a Caucasian male and argues that driver, Drennon, was provided assistance with the route that Plaintiff had been denied. Pl. Mem. 11. Accordingly, the undersigned finds it appropriate to consider this alternative prima-facie requirement in this instance. *See Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) (noting that, when nonmoving party will have burden of proof at trial, the court accepts the nonmoving party's version of the facts and gives that party the "benefit of all favorable legal theories invoked by the evidence so considered.").

While admittedly a close call, the undersigned is of the opinion that Plaintiff has at least raised an issue of fact as to whether he was replaced by someone outside his protected class. *Cf. Hardin v. Belmont Textile Mach. Co.*, 355 F. App'x 717, 721 (4th Cir. 2009) (finding prima facie prong not satisfied when the record included no evidence of replacement with a worker outside the protected class in view of defendant's evidence plaintiff's position was absorbed and performed by a part-time contractor). Accordingly, the undersigned recommends a finding that Plaintiff has set out a prima facie claim of discrimination.

### 2. Pretext analysis

As it is recommended that Plaintiff be found to have set out a prima facie case of discriminatory termination, the court analyzes this claim under the "pretext" prong of the *McDonnell Douglas* test. Summary judgment is appropriate because Plaintiff has proffered no competent evidence from which a reasonable juror could find his termination was based on his

race. *See Reeves,* 530 U.S. at 146–47 ("The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'") (quoting *St. Mary's Honor Center,* 509 U.S. at 506).

The undersigned agrees with UPS that it has set forth a legitimate, nondiscriminatory reason for issuing Plaintiff a discharge letter and terminating him: Plaintiff missed a scheduled pickup and did not timely grieve the issuance of that disciplinary letter. In recommending this finding, the undersigned is cognizant of the issues Plaintiff has raised concerning the nature of the discharge letter and the timing of the grievance. At this juncture, however, Defendant satisfies its burden of production by presenting evidence that would permit a jury to believe its proffered reason for its actions toward Plaintiff. *See Reeves*, 530 U.S. at 142-43 (finding employer met burden of producing evidence sufficient for factfinder to conclude employee was terminated for reason stated by employer). Plaintiff's disagreement with the type of discipline issued and the timeliness of his grievance notwithstanding, UPS has provided uncontroverted evidence that Plaintiff missed a scheduled multi-package pickup. UPS has also provided competent evidence to support the untimeliness of Plaintiff's grievance.

The burden returns to Plaintiff to demonstrate UPS's proffered reasons for terminating Plaintiff "were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253; *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001) (quoting *Burdine*). In attempting to satisfy his burden Plaintiff submits the following reasons he "disagrees with Defendant's assertion that it followed the progressive disciplinary policy," Pl. Mem. 21:

- Plaintiff reiterates his argument that the September 2011 disciplinary action should not have been considered, which would have given Plaintiff a "completely clean record at the time of the April 2012 missed pickup" and permitted Plaintiff to have received a written warning rather than suspension or termination. Plaintiff submits "Defendant intentionally

ignored the progressive disciplinary policy for the purpose of creating a reason to pretextually terminate his employment." Pl. Mem. 22.

- Plaintiff notes he initially received a written warning concerning the April 2012 missed pickup and again indicates he did not receive notice of termination until May 7, 2012. He also claims he never received the certified letter UPS claims to have sent to him, arguing "Defendant has failed to even establish their allegation that Plaintiff received notice of his termination." *Id.* In addition, Plaintiff again references the corrective nature of language in the Termination letter that may have lead Plaintiff to believe he was not being terminated. *Id.*;

- Plaintiff claims Defendant "pretextually terminated [him] by distorting the language of the CBA in its attempts to convince the Court it had a legitimate reason to terminate Plaintiff." *Id.*

Plaintiff argues he should survive summary judgment by showing Defendant's proffered reason for his termination was false, noting plaintiffs no longer need to establish "pretext plus," Pl. Mem. 21, which had required plaintiffs to demonstrate both that the employer's stated reason was false and that discrimination was the "real reason" for the adverse action. *See Reeves*, 530 U.S. at 146–49. In this section of his brief, Plaintiff rests on these arguments that show UPS's stated reasons for terminating him were false, arguing this entitles him to proceed to a jury. However, the *Reeves* Court also noted a plaintiff cannot prevail only by showing the employer's proffered reason was untrue, "the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 2108.

Further, while Plaintiff has raised factual issues regarding the process and application of the progressive discipline system applied to him, the undersigned is of the opinion that the "proffered reason" that Plaintiff would need to demonstrate is "false" would not be the procedural issues Plaintiff has raised with whether UPS followed the process. Rather, the proffered reason to be considered at this stage would be the substantive reason given for the termination—that Plaintiff had multiple missed package pickups on April 11, 2012.

As another court in this district has noted,

> [C]ourts have generally recognized that an employer's unfair deviation from its own termination procedures or its failure to adhere to common notions of fairness in the termination process is not probative of discriminatory intent and cannot show pretext. *Duggan v. Sisters of Charity Providence Hosps.,* 663 F. Supp. 2d 456, 470 n.6 (D.S.C. 2009) (rejecting plaintiff's attempt to establish pretext by pointing out that the defendant rushed to judgment to terminate him, failed to interview witnesses or the plaintiff himself, failed to follow its own policy, and failed to consult with the plaintiff's supervisor before deciding to terminate him); *see also Randle v. City of Aurora,* 69 F.3d 441, 454 (10th Cir. 1995) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.").

*Addison v. CMH Homes, Inc.*, 47 F. Supp. 3d 404, 421–22 (D.S.C. 2014). Put another way, the court is not to act as a "super-personnel department[,] weighing the prudence of [the employer's] decisions." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks omitted).

Plaintiff has not satisfied his burden of showing UPS's disciplining Plaintiff for missing a scheduled package pickup was "false." Further, despite Plaintiff's argument and evidence regarding the confusion as to the level of discipline issued and the timeliness of his resulting grievance, Plaintiff has not provided any facts from which a reasonable juror could determine illegal discrimination was the "real reason" for his termination. In fact, the only mention of racial discrimination in this portion of Plaintiff's memorandum is his unsupported statement that "Defendant terminated Plaintiff, *who was known for speaking up against racial inequalities in the workplace*, under the pretext he was a bad employee when clearly this is not the case." Pl. Mem. 18 (emphasis added). Plaintiff does not point to any evidence about how he "was known for" standing up for racial inequalities. A general statement such as this, unsupported by record evidence, is not competent evidence to be considered on summary judgment. *See Campbell v.*

*Hewitt, Coleman & Assocs., Inc*., 21 F.3d 52, 55 (4th Cir. 1994) (noting when a movant provides evidentiary support for a summary judgment motion, the nonmoving party generally needs to come forth with some opposing evidence).

As additional support for its summary-judgment argument, UPS notes the September 2011 discipline was issued by former Aiken Business Manager Hazel Bennett who, like Plaintiff, is African American. While not determinative of the issue, the court agrees this fact is an additional reason Plaintiff has not established sufficient pretext to survive summary judgment as to his termination claim. *See Myers v. Wood*, No. 0:12-CV-00422-JFA, 2013 WL 4823171, at *8 (D.S.C. Sept. 9, 2013) (finding plaintiff failed to establish prima facie race discrimination claim based in part on fact that decision-maker and plaintiff were of same race); *see Wilder v. Columbia Fire Dep't*, No. C/A 3:07-976-CMC-BM, 2008 WL 3010084, at *6 (D.S.C. July 31, 2008) (considering factor that decision-maker and plaintiff were both African American in finding plaintiff had not established pretext; citing *United States v. Crosby,* 59 F.3d 1133, 1135 n.4 (11th Cir. 1995) (reasoning that where a decision-maker is of the same race as plaintiff, the plaintiff should present evidence to show that the decision-maker held members of his own race to a higher standard of conduct than members of another race)).

"A plaintiff is entitled to a trial on the merits of a Title VII claim if [he] . . . establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of discrimination." *Darvishian v. Green*, 404 F. App'x 822, 828 (4th Cir. 2010). Plaintiff has not carried this burden. No reasonable jury could conclude that racial animus was a motivating factor. Summary judgment is appropriate as to Plaintiff's Title VII[19] discrimination claim.

---

[19] Plaintiff's race discrimination claim in his Amended Complaint cites 42 U.S.C. § 1981; however, he never references any § 1981 claims in responding to summary judgment. In any

B. Retaliation claim

Plaintiff also brings a claim of retaliation in violation of Title VII.[20] Title VII proscribes discrimination against an employee because, in relevant part, he "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). Employees engage in protected oppositional activity when, *inter alia*, they "complain to their superiors about suspected violations of Title VII." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.,* 333 F.3d 536, 543–44 (4th Cir. 2003). When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *See Foster v. Univ. of Md.-E. Shore,* 787 F.3d 243, 249 (4th Cir. 2015) (confirming the *McDonnell Douglas* framework remains appropriate when Title VII retaliation plaintiff is not proceeding under direct-evidence theory). "To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove '(1) that []he engaged in a protected activity,' as well as '(2) that h[is] employer took an adverse employment action against h[im],' and '(3) that there was a causal link between the two events.'" *Boyer-Liberto*, 786 F.3d at 281 (quoting *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405–06 (4th Cir. 2005)). If the plaintiff presents a prima facie case, the burden then shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or his claim will fail. *See Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). In the Title VII retaliation context, a plaintiff must prove retaliation was the but-for cause of the adverse employment action. *See Nassar*, 133 S. Ct. at 2533. In other words, the successful plaintiff in a Title VII

---

event, the analysis for discrimination claims brought pursuant to § 1981 is the same as those brought pursuant to Title VII. *See Gairola,* 753 F.2d at 1285–86.

[20] Although Plaintiff's Amended Complaint does not specify the statutory scheme on which his retaliation claim is based, in his memorandum Plaintiff discusses only a Title VII retaliation claim. *See* Pl. Mem. 24–31.

retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524–25. In *Foster*, the Fourth Circuit clarified that the but-for causation standard is not applied at the prima facie stage; rather, the but-for causation requirement is part of plaintiff's proof at the pretext stage. 787 F.3d at 252.

Plaintiff seeks to prove his case using the *McDonnell Douglas* framework. *See* Pl. Mem. 24. To show his prima facie case, Plaintiff must establish he participated in protected activity, UPS took an adverse employment action against him, and there was a causal link between the two. *Boyer-Liberto*, 786 F.3d at 281. In addition to claiming his termination was retaliatory, Plaintiff also argues Defendant retaliated against him by wrongly disciplining him for things that "would have been overlooked" if it were not for "Plaintiff's race and his consistent complaints of racial discrimination at the Aiken Center[.]" Pl. Mem. 32. Plaintiff also testified that UPS "started making mountains out of mole hills," noting Smaltz's refusal to sign Plaintiff's grievance submitted after termination and his being required to travel to Maryland for his grievance hearing. Pl. Dep. 287–89. According to Plaintiff, the retaliation also took the form of his being refused the help he requested on his route. *Id.* at 299. The gist of Plaintiff's claim is that he was retaliated against for his "many years" as union steward during which he "represented many hourly employees in grievances and in issues that involved race." Pl. Mem. 24. In his deposition, Plaintiff testified that, generally, "[i]f a situation arose about a minority in the building, particularly if I was involved in it, it was hard to get them to see what was fair to spite me." Pl. Dep. 185.

In addition to making such general statements, Plaintiff provides the following evidence to support his claim of retaliation:

- In around 2007 (or possibly 2010 or 2011) acting as Union steward Plaintiff investigated a claim and represented Charles Devine (African American) who had a confrontation with "a white guy, Roy [Landrum]," and Devine was to receive a warning letter although Plaintiff's investigation indicated Roy instigated the confrontation. Plaintiff and Devine met with then-Center Manager Paul Hendrix (Caucasian), who had planned to give a warning letter to Devine until Plaintiff convinced him it had been Roy who instigated things. Shortly after that meeting, Paul was "huffing and puffing" and asking Plaintiff why he would side with the employee and that it would "come back to haunt [him]." Drivers Landrum and Gary Edge told Plaintiff they "didn't like" that he was representing Devine. Pl. Dep. 272–76.[21]

- In around 2005 or 2006 (or possibly 2010 or 2011), Plaintiff represented Ricky Smith (African American) in grieving an issue of Smith's name being moved down in priority on a list for being a driver—a list that was supposed to be prioritized by seniority. Plaintiff indicated he "kept interfering" and complaining to Union President L.D. Fletcher about how Smith was being treated. Fletcher wanted to put another driver Krause, who was Caucasian, ahead of Smith on that list. That case "fell apart" when Krause was terminated. Pl. Dep. 277–81.

- In 2011 or 2012 Plaintiff assisted Phillip Mealing because management kept "BS-ing him" when it came time for him to go to driving school. Management kept putting Caucasians ahead of Mealing on the supposedly seniority-based driver list. Plaintiff indicated drivers Gary Edge and Steve Huff warned him his "civil rights" involvement could cause him to lose his job. *See* Pl. Mem. 25, Pl. Dep. 185, 281, 285.

1. Prima facie case

    a. Protected activity

Defendant first argues summary judgment is appropriate as to Plaintiff's retaliation claim because he has not demonstrated he participated in any protected activity. In its principal summary judgment memorandum, Defendant focuses on Plaintiff's representation of Devine, Smith, and Mealing, arguing Plaintiff has not shown his representation of these individuals constituted protected activity. Def.'s Mem. 28–29. To establish the element of protected activity,

---

[21] In Plaintiff's deposition he indicates he was told by another UPS driver that Devine heard Smaltz telling Kenneth Holmes that Smaltz "helped Rick get [Plaintiff] fired, is what we did. We showed his ass." Pl. Dep. 298. This statement is inadmissible hearsay, however. The law does not permit a plaintiff to rely on hearsay to defeat a properly supported summary judgment motion. *See Md. Highways Contractors Ass'n v. State of Md.,* 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.").

Plaintiff must demonstrate that he "opposed any practice made an *unlawful* employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *See* 42 U.S.C. 2000e-3(a) (emphasis added).

Defendant submits that Plaintiff has provided no evidence that, during his representation of Devine, Smith, or Mealing, he complained to UPS about *race* discrimination. Rather, Plaintiff has only provided testimony that he represented those individuals in matters he believed to be racially unfair. Def.'s Mem. 28–29. Defendant argues this is insufficient to be considered protected activity. *Id.* (citing cases).

In response, Plaintiff submits he did engage in protected activity for many years in his role as a Union steward. He argues that, during his time as a steward, "he represented many hourly employees in grievances and in issues that involved race." Pl. Mem. 24. Plaintiff indicates he testified only about the representation of Devine, Smith, and Mealing in his deposition because they were the "most severe examples of him standing up for the rights of others who have been racially discriminated against[.]" Pl. Mem. 25. Further, Plaintiff submits those three examples are not the only instances on which he relies for his retaliation claim. *Id.* He does not, however, provide any additional record evidence to support his claimed reporting of race-based issues. He does note that several individuals—two fellow drivers and Union President Fletcher had warned him that he might lose his job because of the "civil rights stuff." *Id.* (citing Pl. Dep. 185, 285).

In reply, Defendant argues that Plaintiff has proffered no additional evidence probative of an actual complaint to UPS regarding race-based discrimination. Def.'s Reply. 10–13. Defendant

submits Plaintiff must provide more specific evidence of actual complaints to UPS's management regarding alleged race-based discrimination, and he has not done so.

The undersigned agrees with Defendant that Plaintiff's proffered evidence lacks detail of precisely what his alleged protected activity was and what unlawful, race-related conduct his activity reported. In considering this prong of Plaintiff's prima facie case, though, the undersigned is mindful that the Fourth Circuit recently expanded the scope of what may be considered a protected activity in the Title VII retaliation context. In *Boyer-Liberto*, 786 F.3d at 282, the court "made clear that [courts] should [] interpret 'unlawful employment practice' [in the protected-activity realm] broadly." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416–21 (4th Cir. 2015) (quoting *Boyer-Liberto*, 786 F.3d at 282); *see Boyer-Liberto*, 786 F.3d at 282 ("[A]n employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress.").[22] As explained in *Boyer-Liberto*, decisions from the United States Supreme Court require that "Title VII [] be read 'to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,' because 'effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances.'" *Boyer-Liberto*, 786 F.3d at 283 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66–67 (2006)).[23]

Looking to the *Boyer-Liberto* decision, the *DeMasters*' court reversed the grant of summary judgment on a retaliation claim in part based on the district court's "myopic analysis" of the plaintiff's opposition as a series of discrete acts. *DeMasters*, 796 F.3d at 417. Rather, the court counseled as follows:

---

[22] Although neither party cited either *DeMasters* or *Boyer-Liberto*, principles from these two published Fourth Circuit cases are appropriately considered herein.

[23] In *Boyer-Liberto*, the Fourth Circuit reversed the grant of summary judgment, finding that even the reporting of a one-time use of an especially offensive racial epithet could be the basis for creating a protected activity for that plaintiff's retaliation claim.

> We conclude from this review of the statute and case law that we must examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole. Although individual acts may be scrutinized to ascertain their nature, purpose, and nexus to the alleged objective, the touchstone is whether the plaintiff's course of conduct *as a whole* (1) "communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination," *Crawford [v. Metropolitan Government of Nashville and Davidson County, Tenn.*], 555 U.S. 271, 276 [(2009)]; and (2) concerns subject matter that is "actually unlawful under Title VII" or that the employee "reasonably believes to be unlawful," *Boyer-Liberto,* 786 F.3d at 282.

*DeMasters v. Carilion Clinic*, 796 F.3d at 418 (emphasis in *DeMasters*).

While the undersigned notes it to be a close question based on Plaintiff's failure to proffer more specific details of his claimed protected activity, the undersigned is satisfied that he "reasonably believed" he was opposing unlawful practices that violated Title VII in at least some of his representations of African-American employees. Given Plaintiff's relatively light burden of demonstrating a prima facie case, the undersigned recommends giving Plaintiff the benefit of the doubt and finding he has set out sufficient information to support the first prong of the retaliation prima facie case.

### b.  Causal connection

The parties do not discuss the second prong of the prima facie retaliation case—an adverse employment action—and it is certainly beyond dispute that Plaintiff's termination was an adverse action.[24] The court then considers the prima facie causation requirement. "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir. 2004). However, the temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an

---

[24] Plaintiff's questioning of prior discipline received generally focuses on the progression of discipline that led to the April 2012 termination.

employer's knowledge of protected activity and an adverse employment action" was "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (internal quotation marks omitted). When temporal proximity is absent, "evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (citing *Farrell v. Plantars Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000), and *Miles,* 429 F.3d at 490 (noting the Fourth Circuit's determination in *Causey v. Balog,* 162 F.3d 795, 803 (4th Cir. 1998)).

UPS argues Plaintiff cannot establish prima facie causation because the decision-makers at the time of his termination—Boulware and Smaltz—were not aware of Plaintiff's taking part in any complaints about inequitable treatment based on the race of an employee. Def.'s Mem. 29-30. In support, Defendant has proffered the declarations of Boulware and Smaltz to that effect. Boulware testifies that Plaintiff never complained to him about "race discrimination or racial inequities" while Plaintiff was employed at UPS, nor was he aware of Plaintiff's "making complaints in his role as a Union steward or otherwise to UPS management about African-American employees being treated unfairly compared to Caucasian employees." Boulware Decl. ¶ 12. Further, Boulware specifically stated he was not aware of Plaintiff's representing Devine, Smith, or Mealing regarding issues concerning perceived racial inequality. *Id.* Smaltz testified similarly. Smaltz Decl. ¶¶ 14, 15 (stating Plaintiff never complained to him about racial inequality, and he was unaware of Plaintiff's representing Devine, Smith, Mealing, or other employees in the grievance process concerning issues relating to race discrimination or racial inequality).

UPS also argues the events Plaintiff claims as protected activity are not temporally close enough to his termination to provide the requisite causation based on timing alone. Def.'s Mem. 32.

In response, Plaintiff provides his own sworn testimony that he "openly opposed racism and unfairness" as a union steward at UPS's Aiken Center[,]" and that he "made numerous complaints about unfair practices regarding race to both Ray Boulware and John Smaltz, as well as former managers, including Danny Ferguson." Pl. Aff. ¶¶ 3, 5. Plaintiff submits that he "spoke with Boulware about the incident" concerning Mealing. Pl. Mem. 54. Although seeming to return to his protected-activity argument, Plaintiff then argues he has at least created a question of fact. Pl. Mem. 28. Plaintiff does not focus on his complaints being temporally close to his termination.

In reply, UPS indicates Plaintiff did not testify he spoke with Boulware about the incident with Mealing, but that he testified Boulware was the Aiken Business Manager at that time. From the record available to the court, UPS's reading of the record on this point seems to be correct.

The undersigned agrees with UPS that Plaintiff has not established prima facie causation for his retaliation claim. For purposes of this Motion, the court construes all genuine issues of material fact in favor of Plaintiff. However, to the extent Plaintiff's general affidavit testimony that he made race-related complaints to Boulware and Smaltz imputes knowledge of Plaintiff's protected acts to them, knowledge alone does not establish causation. In other words, it does not necessarily follow that Plaintiff's having made race-related complaints to Boulware and Smaltz was the reason he was terminated. *See Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 182 (4th Cir. 1998) ("Knowledge is necessary to establish causation [in retaliation context], but it is not sufficient.") (citations omitted); *see also Jones v. GT*

*Contracting Corp.*, No. CV DKC 14-3539, 2016 WL 704319, at *8 (D. Md. Feb. 23, 2016) (citing *Gibson* and granting summary judgment because plaintiff had not provided evidence defendant had been motivated in some way by plaintiff's protected activity to take adverse employment action). The undersigned recommends summary judgment be granted to UPS on Plaintiff's retaliation claim because Plaintiff is unable to establish his prima facie case.

2.  Pretext

Even if Plaintiff has established a prima facie case, summary judgment remains appropriate as to his retaliation claim. As more fully set out above in the Title VII discrimination analysis, Defendant has presented ample evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination: UPS provided uncontroverted evidence that Plaintiff missed a scheduled multi-package pickup, as well as competent evidence to support the untimeliness of Plaintiff's grievance. In addition, as discussed above, UPS has set out legitimate, nondiscriminatory reasons for the disciplinary actions that led up to the termination. That Plaintiff disagrees with UPS's actions is not enough. In considering whether the reasons given are legitimate and nondiscriminatory, the court need not determine the employer's reasons are "wise, fair, or even correct" so long as they were the reasons for UPS's actions. *DeJarnette*, 133 F.3d at 299.

The burden then shifts to Plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons "'were not its true reasons, but were a pretext for discrimination.'" *Foster*, 787 F.3d at 250 (quoting *Reeves*, 530 U.S. at 143). To carry this final burden, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct[,]" or, in other words, to "show that the harm would not have occurred in the absence of—that is, but-for—the defendant's conduct.'" *Id.*

at 252 (quoting *Holland v. Wash. Homes*, 487 F.3d 208, 218 (4th Cir. 2007) and *Nassar*, 133 S. Ct. at 2525) (internal quotations and alternations omitted).

Plaintiff's pretext argument is essentially a rehash of his pretext argument discussed above in connection with his discrimination claim. The undersigned is of the opinion the evidence Plaintiff has provided is insufficient for Plaintiff to establish the but-for causation required in establishing pretext. Plaintiff again raises the argument that he *was* timely in grieving his termination, but that Smaltz's refusal to sign his grievance evidences retaliatory animus. Pl. Mem. 30. Plaintiff also cites to Sizemore's deposition testimony that management had previously communicated it was acceptable for a pickup to be late if a customer was okay with the lateness of that pickup. *Id.* (citing Sizemore Dep. 14–15). Plaintiff also again looks to his customer's statement that he did not make an issue of the missed pickup. *Id.* Accepting these statements as true, they do not permit a reasonable juror to determine the reasons UPS has given for its actions toward Plaintiff were false or that, but for retaliatory animus aimed at Plaintiff for his claimed protected acts, he would not have been disciplined or terminated. Summary judgment is appropriate as to Plaintiff's retaliation claim.

IV.     Conclusion

For the reasons set forth above, the undersigned recommends Defendant's Motion for Summary Judgment, ECF No. 49, be granted as to his discrimination and retaliation claims. Further, to the extent Plaintiff had attempted to bring a separate cause of action for harassment/hostile work environment, he has abandoned any such claim by not responding to Defendant's argument about that claim. As it is recommended that all of Plaintiff's claims are subject to summary judgment, this matter should be ended.

IT IS SO RECOMMENDED.

April 18, 2016                                      Kaymani D. West
Florence, South Carolina                           United States Magistrate Judge

The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."